Good morning. We are ready for argument in our first case. Mr. Fischer. Thank you, Your Honor. May it please the Court, my name is Barry Fischer, and together with Robert Tucker, I represent Thomas Hager. I would be happy to answer any questions the Court may have about any of the issues in the case, but I would like to focus my discussion on two issues and to touch briefly on a third time permitting. And those are, first, point one, the claim that the jury instructions and summation arguments by the prosecutor licensed the jury to convict Mr. Hager based on a legally invalid theory as to the required nexus between the murder and the drug conspiracy. And second, point four, the claim that the Court erred in excluding mitigating evidence, testimony and video evidence, from Mr. Hager's daughters. And third, point two, that the Court wrongly treated the jury as anonymous in the courtroom. I would like to begin with point one. And I would like to talk about the government's theories, including the ones particularly that they presented in their summation as well as some of the new ones they presented on appeal. But I think first it is critical to highlight for the Court the different legal issues, the different One of the claims is a sufficiency claim, that the evidence was not sufficient to support a valid legal theory. And the Court is familiar with the standard for sufficiency claims, and it is a difficult standard, as we acknowledge. But the other claim, and the one we're really focusing on, is the instructional claim. And I think it's critical to highlight, because I think this gets lost in the government's brief, and we tried to focus on in our reply brief, what the legal issue is. The legal issue is if the Court agrees with us that the jury was invited by the instructions and summation arguments to convict on an invalid theory as to the nexus element, then the question becomes, are you going to reverse the conviction? And at that point, the burden falls on the government to prove beyond a reasonable doubt that the jury, notwithstanding that error, convicted solely on a valid legal theory. That's the standard this Court set out in Hornsby and other circuits have acknowledged. And that's really an impossible standard for the government to meet in this case, particularly because of the emphasis they put on the invalid legal theories in their summation arguments. And so let me turn to those theories. And the first, and I think most important... Let me understand where you've gone with that. You're saying if the instruction is incorrect, you don't want us to simply just remand for possible retrial with the correct instruction, but to reverse because the legal theories, you say, are invalid. Not quite, Your Honor. If the issue that the Court grants relief on, if the Court agrees that the instruction together with the summation arguments that fueled it were incorrect, that led the jury to convict on an invalid legal theory, if that's the only issue we went on, then the remedy would be a new trial. We think the Court also would then need to reach the sufficiency issue. And if it found that the evidence was legally insufficient to support conviction on any valid legal theory, then it would have to dismiss the indictment. And if we were, why would we go in that direction? Why would we not decide the sufficiency first? You could, Your Honor. I mean, it would seem you wouldn't want to have to deal with an instruction if you think there's, even if you instructed it was insufficient. You could, Your Honor. We think the Court needs to address... in any event. I guess I'm just thinking, typically in a criminal case, when you're arguing, the first thing you do is you argue for the reversal. Then you go for the new trial, if that doesn't work. But it seems as though you are saying you want to do, talk about the new trial first, and then move into, connect that to the sufficiency, because I guess the facts intertwine. Exactly, Your Honor. I think in the course of discussing the instruction, I'll be discussing why the theories were not legally valid, and why there wasn't sufficient evidence to support a legally valid theory. Well, also, you have a problem with the burden of proof if you attack sufficiency first. Your burden is so high with sufficiency, and yet, if you're arguing the instruction is invalid, you get to shift that burden to the government. We do acknowledge the sufficiency burden is a high burden, Your Honor. We do acknowledge that, and I think the burden when it comes to the instructional issue is quite different. Let me start with what I think is the most important of the government's theories, and the only one that you really need to know about to know that this case requires reversal in a new trial, which is the self-preservation theory. This is the theory that the murder was sufficiently connected to the drug conspiracy because by committing the killing in order to avoid retaliation from these two men that Mr. Hager had shot, that Mr. Hager would be able to stay alive and continue to peddle drugs. Now, this theory is argued by the government in their main summation, and it's particularly emphasized in their rebuttal summation. They talk about, they say, this is on Record Appendix 1325, and in terms of the nexus, in a meaningful way, what could be more meaningful than self-preservation? And then a couple of paragraphs down. What could be more meaningful than to be able to, without fear, to go out there and peddle crap day after day after day? And then at the bottom of the page on 1326, later on, it says, so in every respect, whether the big picture, the self-preservation, okay? Are you, when you go through the list of proffered reasons, are you going to get to the in-furtherance of the drug conspiracy in your laundry list? Well, yes, Your Honor. Our position is that the government, that's what the government needed to show, is that there was some in-furtherance of drug conspiracy. The problem with this self-preservation theory, and maybe I'm not understanding your question correctly, this self-preservation theory was not a legally valid theory. It was not, in fact, it's one the government really has abandoned in their brief. Is the in-furtherance of the murder as being in-furtherance of the drug conspiracy a valid theory? That's, yes, that is a valid theory. That's what the, well, that's, I guess I wouldn't call that a theory. That's what they had to show, in our view, and that's what the case law firmly establishes they need to show. Now, the government claims they showed that, but the problem is if you look at the theories they're presenting and this self-preservation theory, that's not an in-furtherance of the drug conspiracy theory. That's not a legally valid theory. Well, then what do we make of the fact that you appear to have conceded that it was in-furtherance? Well, I don't think there was a concession. Would you like me to turn to that issue, that waiver issue? In the Rule 29, I was just talking about, of course, in the Rule 29 motion that you said, clearly, clearly, this killing based on the evidence that the government has offered certainly furthered drug trafficking. This conspiracy, his conspiracy, it certainly furthered it. It couldn't be more clear. I think you have to look at that comment in full and in the context in which it was made, and we talked about this quite a bit in our reply brief. This is the morning of the Rule 29 argument, right before the argument. Yeah, the judgment for acquittal. Yes. Which tests the sufficiency. Yes. Mr. Hager's counsel handed up to the court, and this is something the government's brief completely ignores, a written Rule 29 motion, which is in the record, and what this Rule 29 motion focuses on is a theory for dismissal, which is that the government has not established a sufficient connection because they haven't shown that this murder promoted, advanced, that its immediate purpose was to promote or advance the drug conspiracy. And this is a lengthy pleading, this Rule 29 motion. It is, we talk about this in our reply brief. It's at 1396 of the joint appendix. Then what happens is they go into court, the judge reads this, and they had two theories for dismissing the indictment for their Rule 29, okay? And the government talks exclusively about another theory, and this is, the other theory is one that they discussed in the oral Rule 29, which is there needs to be a drug deal or something like that happening at the time of the murder, okay? But that's not the theory that's presented in the written motion. The written motion presents an additional theory. Now, the remark Your Honor fastened on, at one point, there's really, it's rather an ambiguous remark because when you read the rest of what the attorney says, in the middle of the argument, he says, you have to do something when people steal your guns. So he's really talking about, perhaps, the shooting of the two men who had ended up with his gun. But the point of this is there's a legal framework for the court to address this, which is the law of waiver. And there are situations in other cases where the government comes in and says, well, I know the defendant filed this motion or made this request, but he waived it. He later withdrew it. And there's no basis to find a waiver of a written pleading, which is quite clear. This Rule 29 motion is quite clear throughout. It talks about it didn't promote, it didn't advance the drug conspiracy. There's no basis to find a waiver from one ambiguous remark. That would be completely irrational to hand the court a pleading that makes an argument and then take it back. The statute that the defendant was indicted under essentially, I guess, could be broken down in three different parts. That first part dealing with the kingpin, where it's a continuing enterprise type. The second part being in furtherance of a continuing enterprise. And the one that it seems that the focus here deals with the engaging aspect of it, and I suppose that is what you are dealing with here. Are you challenging the meaningful connection language in the instruction here? We're saying the instruction didn't tell the jury enough about what the connection, what kind of connection there had to be. And it's that language. The language that the trial judge used was meaningful connection. Are you challenging that is what I want to know. Yes, we are. And the defense did object at the charge conference to the court's instruction and proffered their own instruction, which, again, embodied sort of their two arguments, only one of which we're focusing on here. It embodied their argument about there has to be a drug deal going on, but it also embodied their argument about how there has to be a promoting or advancing or furthering whatever word you want to use. They used a different language in their instruction, their proposed instruction. But trial judge, when you were using it, discussing the in furtherance of, you were not referring to the second prong, the in furtherance of a continuing criminal enterprise. It's a very confusing statute, Your Honor, because it talks about, the statute talks about the kinds of people who are covered. So you have people who are engaging in a CCE, continuing criminal enterprise, people who are furthering a CCE. That's not here because it's not a kingpin. Right. It's not in furtherance of a continuing criminal enterprise, so that's not it. So we're dealing with the engaging. Yes, we're dealing with the engaging. And the conspiracy to distribute or whatever crack cocaine. Right. The statute says a person engaging in this specified drug crime who intentionally kills. Now, the problem, it's not as clearly written a statute as it could be, but the point that we're making is you have to look in the statute for a connection between the murder and the drug conspiracy. It can't be entirely unconnected. And the connection is found in the engaging in language, that the engaging in language has to be read to modify not only the kinds of people you're talking about, but the murder. Otherwise, there's no connection in the statute, and it's really not this court's job or any court's job to make up a connection. It needs to construe the statute. The trial just said that it had to be done connected in a meaningful way to the drug conspiracy. Correct. That's a very broad usage there. I mean, if it's a meaningful way, then that really allows for quite a bit. Well, Your Honor, our argument is the modifier meaningful was, as far as a juror would have been concerned, meaningless. It tells the juror nothing. And, in fact, this instruction is something the prosecution then drove a truck through because, to go back to their arguments, they argue self-preservation, which they abandoned on appeal, but which is something the jury could have clearly relied on. It's very important to note that the defense conceded this. Well, the word meaningful is defined as having a serious, important, or recognizable quality or purpose. That's a pretty strong word, isn't it? Your Honor, that's one definition, but even that definition, recognizable, recognizable means just it's something you can articulate. I think meaningful really doesn't have that definition, but I think also what's important is you have to look at the prosecutor's arguments because he told the juror self-preservation is meaningful, and nobody contradicted him. The defense counsel had conceded self-preservation. They said this is a murder not really about drug dealing but about self-preservation. And then the prosecutor got up and said, yes, that's right, and that's why you should convict him. So that's something the jury could have easily fastened on to.  That's another theory the government pressed, which, again, involved this sort of multilayered reasoning where you kind of work back ten different steps that basically amounts to no connection at all. The statute, in effect, as they want to read it, is one where a drug dealer is permanently under some sort of umbrella of federal jurisdiction as long as a creative prosecutor can come up with a connection. Can we talk about, one, it is the language of the statute is hard to ground. We have said that the connection has to be more than a temporal connection. It has to be a substantive connection. I wonder if our cases interpreting 924C aren't a useful guide with respect to the relationship between carrying the gun. It uses the language in furtherance of any crime. Is that a useful analog? Well, I think our language, the language of this statute is stronger. It doesn't say in relation to. The government does rely on 924C. But I think 924C, even as the government uses, it helps our position because what this court and the other courts have said is for a 924C violation, you either need in furtherance of or you need during and in relation to. What does during and in relation to mean? The Supreme Court in Smith said it means it facilitated, that the carrying of the gun facilitated the drug dealing or could have, had it been successful, could have facilitated it. Actually, that's, we have, most of our cases have taken the position that in relation to is to be interpreted extremely broadly and that what is to be read out is the instance in which the gun is present by accident or convenience. For example, the gentleman who has a gun in, I'm not sure even that would do it, but has a hunting rifle in his home that isn't apparently involved in any way in the drug transaction. But we've said it's enough simply if the firearm is present for protection. But still, Your Honor, I think what has happened in the cases this court has affirmed is it's applied the Supreme Court's rule in Smith that there's a facilitated or could have facilitated. In other words, that's the relationship. And if you go back to the government's theories here, that's not, even under that standard, and again we're saying that 924C is a looser standard, their theories don't even meet that standard. They have this theory of self-preservation. They have a theory, well, it all started 10 steps ago with a gun. Neither of those theories. What about the presence for protection? You're talking about in a 924C case? Well, the 924C cases like Lomax that I'm familiar with this court's cases, they talk about it could have facilitated the drug dealing because it protects the person carrying the gun during a drug deal  because it's a facilitation type of relationship. The case that I'm looking at in particular is United v. Reed in which we quoted an earlier case saying that the in relation to requirement is to be construed liberally. And while this requirement isn't satisfied if the presence of the firearm is the result of accident or coincidence, it is enough if the firearm was present for protection. Well, what kind of protection, Your Honor? I think, again, it has to be to facilitate something related to drug conduct. And again, going back to our case, we have a different statute. It doesn't say in relation to number one. And number two, the jury wasn't given any guidance. The jury wasn't given guidance on what meaningful connection means. As Judge Wynn said, really it could have meant anything. And the theories the prosecutor is giving the jury were not legally adequate. Indeed. The Second Circuit in Aguilar said that the government's not required to prove a drug-related motive was the sole primary or most important reason for a killing as long as it was one purpose. Well, Your Honor, the issue of does it have to be the substantial motive, the only motive, the predominant motive, they never even got to that in this case because the court's instructions never even said it had to be a motive. It just said meaningful connection. And if you look at, for example, the government's theory of this originated in a gun, that's not a motive theory at all. So I think they've gone way beyond any precedent in this case, way beyond Aguilar. I would like to, if I could, move to point four, the issue concerning the testimony from Mr. Hager's daughters if the court has no further questions on this issue. I would like for you to discuss the interaction of the three prongs because it seems that that first prong, the connectiveness can be far more tenuous than you would think in the second or the third prong, the second being where you have in furtherance of a continuing enterprise. If you've got a continuing enterprise, by its very nature in the first prong, you've got a conspiracy. But to prove that third one, which is engaging in a conspiracy, is a different, seems to me to be a different animal and seems to be the stronger point when you're dealing with the question of whether meaningful connection is enough or even Aguilar of seeing one purpose if you're dealing with the first prong as opposed to the third prong. And if you interpret it in the singular manner as in which it was instructed here, you kind of read out the bait for the second prong because it's sort of almost in. The idea being is that this group of individuals, first being the kingpin, is clearly within. Then you've got people who are like the hitmen and people in that second prong. And then you've got the engaging in, which makes it really broad. And I'd like for you to discuss the interconnectedness of those prongs. Well, clearly engaging in a drug conspiracy covers a much broader range of people and drug conduct, some of which can be much less serious than a CCE. A CCE is a very high-level drug operation, which this was not. I mean, it did meet the threshold amount, but it was really a low-level operation of cutting up ounces and dealing dime bags. To that point, I'm asking that because engaging in a CCE is direct. I mean, you're engaging in a drug deal while you're killing. That's clearly within. What we are dealing with is engaging in a conspiracy, which is different. And the question being then we can't use the same definition of engaging in that we did in the first prong that we did for the third prong. Otherwise, there'd be no difference. In the second one, we'd be right out. You're right, Your Honor. If you're not engaging in drug conduct at the time of the killing and you're going to basically cover anyone who is involved in a conspiracy, this conspiracy lasted five years, any killing during that time, and just say there has to be some connection that a creative prosecutor can draw, you're really vastly expanding federal jurisdiction. Well, help me with meaningful. The district court said there had to be a meaningful connection. Substitute significant. Would you object to significant connection? Well, I don't think that would be much better. The court's cases on reasonable doubt, like Victor's, say significant can mean weighty, important, or it can just mean something worth mentioning. But we've approved, we've specifically approved the use of significant as conveying to a jury enough information to apply to a given fact pattern. Well, not in this context, Your Honor. We don't have any cases in this context. That's why we're wrestling with this. Again, we're sitting in an appellate courtroom. I think the court really needs to try to put itself in the position of the jury here. The jury was told meaningful connection. They weren't told anything else. They didn't have the benefit of a judge reading case law and reading the elaborations on this. And then they have the government come in and say this is a meaningful connection. Self-preservation is a meaningful connection. The fact that this originated in a gun is a meaningful connection, and no one told them otherwise. But you don't think it would have been a problem if the court had said significant apparently? No, I think it would have been a problem. I think the court needed to say something along the lines of promoting or advancing or integral. Working in furtherance. Working in furtherance. Part of the confusion is defense counsel got off on the word in furtherance, and they thought that wasn't enough, so they kept using different words, and they didn't want the judge to use in furtherance. But they wanted him to instruct on an in furtherance kind of relationship. I'd like to move on to point four. Would you be able to do that in your rebuttal since your time has expired? Certainly, Your Honor. Thank you. Thank you. Good morning. May it please the Court. Jim Trump on behalf of the United States. I'd just like to make one comment with respect to counsel's last comment, and it comes back to the argument at the Rule 29 context in the proffer jury instructions. Defense counsel at trial specifically asked for instruction that said in furtherance of was not enough. That it's not enough for the jury to find that the murder furthered drug trafficking. Let me put that in context. At trial, there was a two-pronged approach. How is meaningful connection more than furtherance of that? I think they're very similar, Judge. In fact, as we pointed out, the use of in furtherance of the 924C context requires a relationship that at times is even more tenuous than what this Court has described in various 848E contexts. Is it similar if we take the Second Circuit's definition where just one is enough or any type of connection? Well, let me get back to Aguilar. The whole line of cases in Second Circuit, that was the instruction, meaningful connection. That was the instruction in Santos, in Dezinar, in Walker, in Aguilar. That was the instruction given. Meaningful was the definition of the nexus, and they relied on Tipton for that instruction. They went back to Tipton and said, Tipton says substantive connection, but substantive connection really doesn't describe it very well. Judges are supposed to tell juries in a very commonplace way, a very common sense way, what the relationship is, and that's why they came up with the instruction meaningful. It was the same instruction given in the United States v. Williams, which is a 2004 case out of this circuit. It's an unpublished decision, but it was, in fact, the instruction given in that case. And there, the drug connection was very tenuous. There was a murder in a drug neighborhood, but no one really knew why the defendant killed him, killed the three individuals in the car. They were there to buy drugs. It was a drug neighborhood. He was a drug dealer. He had a gun. And in commenting on that, they said it was sufficiently intertwined with drug trafficking to satisfy the 840 AD connection. In looking at that interpretation for how we look at this third prong, do we consider how it is defined or used in the first prong? Well, let me get to that, Your Honor. The three prongs are defined in the statute in terms of identifying the people who are culpable under the statute. In other words, there's a group of individuals engaging in a CCE. They are culpable. But those are the higher. Clearly not the defendant here. No. The second group are those who are working in furtherance of the CCE. The furtherance of language in the statute doesn't say the murder in furtherance of the CCE. It says persons who are working in the furtherance of the CCE who then murder. But we don't have a CCE here. Right. That's not it. And then persons engaging in a drug offense punishable, essentially, as a 10-year mandatory minimum. Which is what we're dealing with here. Right. And the question I'm asking is, do we look back to either the first or the second for the definitional use of words like engaging in to determine how to use it in a third prong? No, we don't. Because that was what the Second Circuit did when it used the Tipton definition. They relied on Tipton, Your Honor. And what Tipton said is there is no language in the statute that we can draw on. That's why in Tipton, as discussed also in Aguilar, that it is implicit in the statute that there must be a substantive connection, but the statute doesn't define it. It's implicit, but it's not defined. And then with Tipton, with Jones, with other cases that then follow, the substantive connection has been the language used by almost every circuit that has addressed this. In Jones, for example, which I believe is an Eighth Circuit, the jury instruction actually said substantive connection. In Wray, which is a case from this circuit, the jury instruction that was given was substantive connection. In Williams, as I said, the instruction was a meaningful connection. In Tipton, there was no definition at all. Jones was a first prong case. Excuse me, Your Honor? Jones was a first prong case. I believe so, yes. That doesn't apply. Wouldn't you consider that the third prong, at least, those individuals would be of the three, they would be the least culpable group of people you're talking about? My point is, Your Honor, the prongs. I want to know that answer. Of the three prongs, would you not at least acknowledge that the third one, it's a class of individuals who are least culpable in terms of their activity here? They're surely not a kingpin. They're not hit men. They are engaging in a conspiracy. I think it seems at least intuitively they are least culpable. I disagree with the context of culpable because you can have an 841 drug conspiracy in which it's a street-level conspiracy, in which it's violent, it produces money, it does everything that a CCE does, but it doesn't rise to the level of CCE for the other elements of the CCE, but it's a very violent organization responsible for many deaths. I don't know if we can say, well, they're less culpable than a marijuana CCE in which no one is killed. So the reason for the distinctions in the statute are... It almost sounds like a CCE, a very violent organization that's responsible for many deaths. Well, the CCE also has a financial component and a leadership component. For example, in the Hager's crew... Therein is where I was going with this. You've got the leadership component of it, and here you're not talking about the leaders, you're not talking about the hitman, you're talking about the kingpin. And that's where... And I'm only going there to determine to what extent do we pull from the definition that had been used in the first and second prong for the third prong, and how do we differentiate the two. And this is my point, Your Honor. The three prongs define who falls within the statute, not in terms of the murderer, but who can be culpable for a murder. People who at the top... Yes, Your Honor. There's no question that he was engaging in the offense... That he was engaging in the offense of drug trafficking at the time of the killing, but he was a drug dealer. Does that make a difference? He was a drug dealer. Let me respond to how this was phrased by counsel. He phrases it in terms of theories. These weren't theories, Your Honor. These were facts. What we argued to the jury were the facts of the case from which a jury can logically infer that there was a sufficient nexus to drug trafficking. And what we argued, both to Judge Ellis and to the jury, was that all of these facts... The fact that Barbara White stumbled onto Shanita's apartment, it made Thomas Hager furious. Why did it make him furious? He had told his runners, his 17-year-old flunkies, keep it a secret. Why keep it a secret? Because that's where I stash my guns, my drugs, that's where we stay, that's our safe house, so keep it a secret. So he was enraged that Barbara White was able to find out where this apartment was. I thought he was keeping it a secret because he had shot those two other fellows over there and he was afraid this guy named Seals, who was this woman's boyfriend, and she comes up on the apartment, was going to find him. That's not the reason he was keeping the apartment secret. He told Lonnie Barnett, Arlington Johnson, to keep it a secret independent of the other evidence. Now, after having shot them, that certainly heightened his fears. That heightened his belief. So without shooting them, you maintain he still would have gone over and attacked her anyway because that would have had nothing to do with those two young fellows who had been shot, and it happened to be that they were connected to Seals. I don't know what he would have done had he not shot Chris and Rick. If he had shot Barbara White, or if he had killed Barbara White simply because she had stumbled on the apartment, we may be here in another context, but I don't know what he would have done. But it's the government theory that anybody that would have walked up to that apartment, whether it had been the girlfriend of Seals, who was the hitman, would have been somebody that he would have gone out and killed. It may have been. It may have been, Your Honor, because after the shooting with Rick, he went to Charlie Johnson and said, what should we do? They went out and drove around looking for other members of the crew to kill them. So I can't stand here and say what he would have done. It could have happened. But what did happen in this case is that when she arrived at that apartment, he was furious. He demanded to know, how did she find out where we lived? No one was supposed to know where we lived. As he's killing her, he's demanding to know, how'd you find out? Who'd you tell? Did you tell your baby's father? So certainly because of... He was afraid of that baby's father. Yes, he was. That's really why he went after this lady, Ms. White, is because she was involved with this Seals fellow. And that's how that information would have gotten out. And he knew that Seals was a hit man. He thought that, yes. Could I go back to the language of the statute? I'm not quite sure what your response was to Judge Wynn, but I'm a little unclear in my own mind why there would be differing levels of culpability since the statute simply speaks in terms of its applicability and its imposition of liability on three independent categories of individuals. They're simply separated. They're not ranked, I guess. And that's our point, Your Honor. They're not ranked, and that's why in Tipton, the court said, these are the three types of individuals who fall within the statute. There is no explanation in the statute as to what the nature of the nexus is. But we have to have a nexus because it might be constitutionally infirm under the Commerce Clause if there is no nexus to the underlying drug activity. But you're correct, Your Honor, it did not say CCEs are more culpable versus drug dealers who engage in drug conspiracy. I'm sorry, if you had to flesh out meaningful in a way that imposed some limits on it, would you be able to do that, or how would you do that? Well, I think I would, in terms of this court's review, I would do it the same way they did it in Tipton and subsequent cases which had no further explanation other than repeating the statutory elements. And in Tipton, they said, we looked at the indictment, we looked at the proof, we looked at what was argued to the jury to see if the evidence and the inferences that could be drawn to that evidence were sufficient to satisfy the substantive connection requirement under the statute. And in Tipton, they said, yes. Despite the fact that there was no instruction to the jury, there is no way that a reasonable jury could have convicted without having found that there was, in fact, a substantive connection. And I submit that's the evidence here, that counsel talks a lot about self-preservation. There's legions of cases, many of which were seen as brief, in which drug dealers killed people they believed that were snitches, informants, witnesses. It was about self-preservation. In one of the earliest 840E prosecutions, Chandler killed somebody because they called the police and said there's marijuana being grown on my property. So self-preservation as a drug dealer has been recognized throughout 840AD cases as a reason, a valid motive within the context of a drug enterprise. The fact that Barbara White was going to provide information or he believed information to other drug dealers versus the police, versus the government, doesn't change his motivation in killing her. Well, it can't be just self-preservation standing alone because under that definition, if Mr. Hager believed himself to be threatened by any erratic driver, then it would fall under 840AD. And that's correct, Your Honor. But here, he feared retaliation specifically from the Eli crew, who dealt drugs two blocks away, who were armed. He knew they were armed because he shot two of them. He convinced them to put down their guns and bulletproof vests. And he shot them. And counsel in a brief says, well, there's no evidence there was any conflict. What better evidence of conflict is that Hager shot them? But you're saying that self-preservation in the context of an ongoing drug enterprise. An ongoing drug enterprise in which, as the testimony of Lonnie Barnett and Arlington Johnson showed, was a violent business. Hager was out there 24-7. Lonnie Barnett was a lookout. They constantly feared generally stick-up boys, people trying to evade their turf. This was a general fear, but it was specific now with respect to the Eli crew because of that shooting, because they took Hager's gun, which would be no different than taking his crack or taking his cash or invading his turf. That gun was just as important to drug trafficking as anything he had. Would your position be stronger if the district court had instructed the jury that it needed to find a substantive connection? No, because I think meaningful conveys a more common-sense meaning than substantive connection. I don't think jurors really would have understood substantive connection any more so than meaningful connection. I think in terms of common parlance, the way people normally speak, meaningful conveys a greater degree of significance, importance than substantive. Why not in working in Perth himself? I think if the court looked at the evidence and decided that that was an appropriate instruction it could have, but that was the instruction that specifically defense counsel asked the court not to give. The instruction that they proffered in the context of Rule 29 was a two-fold attack. One is that a drug deal has to be occurring at the time of the murder. And two, and this is why it was a factual concession, is because legally they wanted to instruct the jury that if you find that the murder was in Perth of drug trafficking, that's not enough. And it is your position, I guess, in response to Judge Duncan's earlier question, that with the three prongs we're not talking about different degrees of culpability, but is it your position that proof of any of those can be done simply by showing a tenuous or just a connection? In other words, the level of connection is the same for all three prongs? The description in Tipton is the same. I think it depends on each case, and that's why judges are entrusted with discretion in terms of fashioning jury instructions. But the substantive connection, for example, discussed in a number of cases is someone is working in furtherance of the CCE, but the only thing they do for the CCE is commit a murder. Then the burden is on the government to show, well, why is that person's participation in the CCE and that murder connected to the drug trafficking? And that's what this court struggled with in the Wray case. In Wray, the only evidence of any participation in the CCE or the underlying drug trafficking was a single act of murder. And they said, no, government, you haven't showed why this defendant was connected in a meaningful way to the... or in a substantive way to the drug trafficking. It wasn't the instruction that the court found lacking. It was the evidence, and they found... The Wray case, which was unpublished, went on to say that there had to be a substantive connection, at least the instruction was, between the individual's role in the killing and the participation in the conspiracy. That's right. And that's essentially the same instruction that Judge Ellis had given here, that there must be a meaningful connection between the killing and the drug conspiracy. In terms of... At trial as well, there was a second part of what they were arguing, both to the court and then in attempt to the jury, and that was they wanted the connection between Seals and Barbara White and the Eli place to come out, because they had proffered an instruction that they wanted the jury to find second-degree murder. And so it was in their strategic interest to show that this was related, and that Barbara White had never really left the drug world because of her relationship with William Seals. And they had proffered an instruction to go with this argument that they were making with respect to the connection between the 848E and the murder. And at one point, with respect to Aguilar, Aguilar said there doesn't even have to be a motive, a drug-related motive, if the means of carrying out the murder were drug-related. And again, here, we pointed out, again, argument to Judge Ellis and even with the jury, that by using his drug crew and using them to commit the murder, he was also engaged in a drug-related nexus in terms of the killing. And he said as much. When he went back to the streets, he said, My boys, my boys went hard. They're soldiers now. And it was, again, part of the fact that this was a tight-knit crew. It was a 24-7 drug activity day in, day out. It was violent. They protected themselves with guns, and that, in turn, is what eventually led to Barbara White's murder. In terms of some of the other arguments that were made in Brito that counsel wanted to address too, and I won't get a chance to respond to his arguments, so I will address very briefly the mitigation committee that was excluded at trial. I don't think it's surprising that, under an abuse of discretion standard, that Judge Ellis decided, in his discretion, to exclude three videotaped conversations in which all of the witnesses to those conversations were available to testify at trial. And in the first part of his ruling, in terms of excluding that, it would be cumulative, that all of those people are available. The two daughters were available, Ms. Thomas, Ms. King. Dr. Hill was available. There was an expert notice for Dr. Hill. And the defendant was available. So he said, whatever's in those tapes can come out through live testimony. He was surprised that Dr. Hill didn't testify, and he said, you can put Dr. Hill on to describe the nature of the relationship between the two daughters and the defendant, how long it went on, what it's based on, what it's like. He thought Dr. Cunningham was going to testify to that and invited that testimony as well, because Dr. Cunningham had interviewed numerous family members, including one of the daughters. So in terms of the admission of the evidence of the videotapes, I think it's clear that the judge was within his discretion to exclude that evidence. Now, as to the limits he put with respect to the live testimony, I think the recent Snarr case is directly on point. The Fifth Circuit was faced with almost exactly the same argument as we are faced here, and that is a mother who wanted to testify as to what the impact of execution would be on her young daughter, I believe she was 9 or 10 at the time, and her teach son. And the judge says, no. I've let you have evidence of background. I've let you have evidence of character. I've let you have evidence relating to the circumstance of the offence. But that's what mitigation is, background, character, nature of the offence. And that goes over that line. And the Court of Appeals affirmed. And they affirmed in the wake of arguments that this type of impact evidence, execution impact evidence, is necessary to balance victim impact. They decided in the face of Eighth Amendment challenges, they said, no, there's a limit to mitigation, and that goes over the line. This court said the same thing in the Leidy case. In that case, it wasn't a videotape, it was a letter. But again, the court articulated the standard as to what mitigation was  to limit that sort of testimony. And that's what Judge Ellis did here. The fact that the testimony wasn't more, it didn't describe in greater detail or greater flavor the relationship between the defendant and his daughters, was not the result of Judge Ellis's ruling. He said, no, I don't want people getting up there simply to beg for mercy, to simply say, please don't execute my father. But he did give them leeway in terms of describing the nature of the relationship. Visits, phone calls, Christmas, birthdays. He even went as far to say, look, you can talk about why you think your father loves you. But he didn't want to go that next step in which they wanted to talk about their feelings of loss and grief in the event that their father was executed. Different courts have looked at this, and they've allowed it, and we acknowledge that. There are a lot of judges that, when faced with the very same decision, said, okay, I'm going to allow it. That doesn't make Judge Ellis's reasoning or his analysis incorrect. It just says that's within the discretion of the trial judge. With respect to the anonymous jury, I noted that last week this court, an unpublished decision, U.S. v. Hall, looked at an anonymous jury case, and there was an issue where the judge, Sui Sponte, they ordered an anonymous jury over fears about witnesses. The case involved the murder of a potential witness, and the judge says, in that context, the trial judge said, in that context, I'm going to have a purely anonymous jury with respect to not just the public, but the defense as well. And it was affirmed using the Dinkins analysis. Here, that was the basis of Judge Ellis's concerns were the fears about witnesses. Going back as far as 2006, in motions hearing related to discovery, we articulated and proffered our concerns about witnesses very specifically. We noted how, in 2006, Hager had stabbed another inmate at the Northern Neck facility while we were awaiting trial. Why did he stab him? Because he believed he was a snitch. So we articulated the fears that Lonnie Barnett had because they are the same family, and that he said, look, and we proffered this to the court, the fact that Mr. Hager was locked up, there are still family members who are not. And it was the basis of those fears that Judge Ellis decided to use numbers rather than names. And I'm sure, as the court understands, Thomas Hager had the name of the jury, and they had the questionnaires, and they were not deprived of any right to exercise challenges for cause or preemptive challenges. So, again, it was within the court's discretion to do that, there was an adequate basis for it, and there was no prejudice or error in the result. Unless, court, I see the light has come on, I'd be happy to answer. Tell me again on this instruction, how do you read the purpose of that in working in further set-up language? If, and when Congress, and this is discussed in both Tipton and Aguilar, they go back to the Congressional record, Congress wanted to make sure that hitmen were covered in the engaging in CCE portion of the statute, because just like in 1959, 18 U.S.C. 1959, that statute was enacted because under general RICO principles there were cases in which you couldn't find a hitman part of the racketeering, so there was a new statute created to cover that. Same thing applied here, is that... Why would you need to do that if, because if they are covered, I mean, even as hitmen, if they are engaging in the conspiracy, you don't need to show your analysis in working up, in working up, you just have to show a meaningful connection. And... Why would Congress even put that in there? Because in terms of defining culpability, someone working in furtherance of the CCE could be someone whose only purpose was to come in and kill somebody. The drug... That wouldn't be in furtherance of whatever the conspiracy or whatever was going on if it was a drug type. Well, in those cases, it probably merges, and the same facts that would make someone in furtherance of the CCE are probably the same facts that make that nexus to the murder, yes. But you can also work in furtherance of the CCE as being a courier. That person... But a meaningful connection would not be enough to get a hitman convicted. A meaningful connection would describe... Could describe... Instead of working in furtherance, how to get a hitman. I think the same facts that could prove that the hitman was working in furtherance of the conspiracy could be the same facts that would prove the meaningful connection to the conspiracy or to the CCE. Could be, but you don't need a meaningful connection. You just need to show working in furtherance. No, you still have to prove the connection. Working in furtherance only gets you to... This person falls within the statute because the person who is working in furtherance of the CCE is working in furtherance of the CCE as a courier. So you have to get that... But you still have to show... But to get a snitch, you don't have to show them working in furtherance of, you just have to show the meaningful connection. A snitch in what regard, Your Honor? A snitch in terms of, let's say, someone who's engaged in a conspiracy. Well, maybe a snitch isn't the word I'm using. But the third prong, dealing with someone who's simply engaging within a conspiracy to distribute or sell drugs, to get them, you only need a meaningful connection. But to get a hitman, you've got to have both the meaningful connection and working in furtherance of. You have to prove, yes, that the hitman was working in furtherance of the conspiracy. Otherwise, if you don't prove that, they don't fall within the statute. And you also have to prove that the killing had a substantive connection to the drug activity of the CCE. You have that burden. You have to prove that the person falls within the purview of the statute. If it's working in furtherance, that person falls within purview of the statute, then you have to prove that the killing had a substantive connection to the CCE. You have to prove both. In the engaging in, what the courts have said, that we don't want jurors to fuse the engaging in prong as simply a temporal connection, that while there was a conspiracy going on, there was a murder. So in that third prong, you have to show that they were engaging in the drug activity, but you also have to show that there was a substantive connection between the killing and that drug activity. And the instruction provided by the court that you must find a meaningful connection between the killing and the drug activity we submit was an adequate instruction to channel the jury in terms of these facts. And then the question is, if that is true, if it was an adequate instruction, the only question left then, could a rational jury have looked at these facts and all the inferences drawn in favour of the government and concluded that Hager engaged in the underlying drug trafficking? Yes. And was the murder of Barbara White meaningfully connected to that drug trafficking? And lastly, your argument on the sufficiency aspect of it, did you argue that, in fact, it was the reason that he attacked Ms. White was because he was trying to keep his drugs safe or because of the danger that he faced from the drug perspective, or did you argue, which you stated earlier, that it was because he killed those two fellows who, in fact, were connected with the Eli gang and sealed? In the Rule 29 argument, we argued all of that. In fact, when I went back to the transcript, the court reporter misspelled stash by stab. I said stash house, and it's in the transcript as stab house. But we argued that it was because Barbara White stumbled onto his stash house, his safe house, that he feared that she was going to tell her boyfriend that word was going to get out, and specifically that fear was heightened to a degree of perhaps paranoia because he believed that these guys were going to come back and try to kill him. And we argued all of those facts to the judge and to the jury. And they weren't theories, they were facts. And now counsel cites a few cases in the brief to say, well, if you don't argue to the jury, you can't argue it here. I encourage you to look at those cases because they say nothing of the type. Those were cases in which the Court of Appeals had affirmed on legal principles that were erroneous. For example, a new rule of law that was found by the Court of Appeals. The Court of Appeals then said, well, that new rule of law and these facts sort of mesh, so we'll affirm. Obviously you can't do that. But here we argued the facts. We didn't have theories, we simply had facts. And we said you can conclude from these facts and the inferences from these facts that this was in fact a drug-related homicide. Thank you. Thank you. Mr. Fischer, you have a few minutes to rebuttal. I would like to try to take really just about a minute to clear up a couple of important, I think, misstatements about the issue concerning the daughter's testimony and the anonymous jury, and then spend the rest of my rebuttal time on the point one. First of all, as far as the issue of the daughter's testimony, the idea that all that was kept out is them pleading for their father's life just isn't true. As we talk about at length in our reply brief, the issue, the rulings really take shape at the end of the day, on the 25th of October, and then on the day the daughter's testimony testified, the 29th. And I think the clearest statement of the judge's ruling, where he keeps out that they love their father, how they feel about their father, is after they testify, and he's talking about why he's keeping out the videos too. And he says, here are the things that he thinks are not mitigation, and I'm quoting, the daughters are happy their father is in their life, to see him on Sundays, to hear his voice, just good to hear his voice and see and hear him. It was good to see their father in prison. When he was in Louisiana, they couldn't go see him. They look forward to seeing their father every Sunday. This is all at Joint Appendix 2611, 2612. They are happy to know that they still have a father. They like to get calls from him to be able to talk to him about this stuff. They wish they could see their father, wish their father was in their life. The judge's rulings gutted the core of this testimony. It became something very dry and terse and lacking any emotional content, so the ruling really went far beyond what Mr. Trump seemed to indicate. As far as the anonymous jury, there was never an argument by the government or a reliance by the court on the notion that Mr. Hager had family members outside who could potentially threaten jurors. That was never argued, never relied on. We've allowed that sua sponte. The problem with the anonymity here isn't that it's sua sponte. It's that, number one, it was pointless because Mr. Hager had the names, and number two, even had he had the names, there was no evidence or finding that he was part of some organization that posed a threat to jurors like you had in Dinkins. Well, if it's pointless, what's the problem? Here, unlike cases where we have allowed an anonymous jury sua sponte, there was far more information about the jurors available to Mr. Hager. The problem with the anonymous jury here and in general really isn't the deprivation during the year of knowing the person's name when you have a questionnaire. It's what the jury is led to think by the anonymity and particularly here with the instruction they got that specifically talked about outside information being communicated, the government getting a fair trial, and then later hearing during the sentencing hearing about how Mr. Hager might try to threaten the judge. It's leading the jury to think, my goodness, this guy is under the thumb of law enforcement. He's in prison, and still, we think there's a potential threat to us. That's what this court said in Dinkins is really the prime problem with anonymity is it leads the jurors to think the defendant may be dangerous, and in a capital case where future dangerousness is the critical issue, future dangerousness in prison is the critical issue, at the sentencing hearing it's tremendously prejudicial. So it would have been better to allow the district court to put findings in the record about the reason that there was a basis for concern? Well, there was no basis for concern, and that's why he didn't find it. The district court said cases of this type, kept talking about these kinds of cases, and he talked about jurors being nervous about their names being known. That's just not what this court required in Dinkins. What empirical evidence do you have for that argument that it did in fact affect the jurors? Well, I think this court has often said jurors bring their common sense to the jury room, and if you're a juror sitting there and you're told by the judge, you know this isn't the way it usually works on law and order, and in fact the judge is telling you we're doing something special in this case. We're going to call you by number, and the jurors hear during voir dire, when they return the verdict, this is as they're being reminded. Nobody's using their name. Again, that's an argument by you. Is there any empirical evidence out there that jurors think like you argue? Well, Your Honor, this court said it in Dinkins. They said unwarranted anonymity, that's the problem with it, is it leads jurors to think the defendant is dangerous, and that's what other circuits have said. Didn't the district court... It appears that the district court considered Hager's earlier conviction of obstruction of justice and the fact that government witnesses had expressed fear about testifying. Is that not correct? No, first of all, I don't think that's what the court said. If you look closely, the government... Because it is what I said, accurate, though. No, I think the government mentioned those things, but that's not what the court relied on, and his obstruction of justice involved 10 years before calling out to someone in a jail cell, hey, you know, try to throw your testimony. The idea that he had part of an organization that was going to threaten jurors, that's what you see in the anonymity cases like Dinkins, where the person has people outside. I want to hit a couple of, I think, very critical points on the 848 issue. The government talked a lot about this meaningful connection instruction has been approved in Tipton and all these other cases. That's just not so. If you look at Tipton, there was a problematic instruction in Tipton. And Tipton is important because it's the only published decision by this court. And what the court said in Tipton is it was concerned about this instruction. It said that... It acknowledged that the connection was not, quote, clearly expressed. But then, and this is equally important, it went on to affirm because it found that that lack of clarity, that lack of sufficient connection was not a problem in this case because the government's arguments to the jury and the government's evidence expressly linked each of the nine murders of which the appellants were severally convicted to a furtherance of the CCE's purposes, silencing potential informants. So in other words, what the court said in Tipton is we're not approving this instruction, but we don't think it's a problem here because the government's evidence and its arguments solely honed in on an in furtherance theory. Okay, so they're basically applying the standard that I urged the court to apply when I first stood up. And it's clearly not met here. The Stash House theory, Judge Wynn, you asked about that, that was never argued to the jury in summation, and it's completely unsupported. The issue of the motive to kill Barbara White, Barbara White didn't have any connection to police who were going to come seize drugs or some other nonexistent drug dealers. I'm sorry, could I ask you a question? Yes, Your Honor. What instruction did you say you specifically argued for when you stood up? The instruction that we're urging the court to adopt is something along the lines of promoting, advancing, or furthering, in other words, whatever verb you want, they're all synonyms, the drug conspiracy. Because you didn't want it below. Your Honor, let me talk about that briefly and try to answer that question, and then I'll sit down. The defense in the Rule 29 motion and in their proposed instruction kept talking about language like in furtherance of, promoting, advancing, integral purpose. They had it in their mind, and I think they were wrong about this, that in furtherance of somehow wasn't strong enough. That particular word wasn't strong enough. And that's why they told the judge, Judge, don't use that word, use these other words. But what they were urging was really synonymous with in furtherance of, and if you read their Rule 29 motion, it's clear that's the connection they were saying the judge needed to instruct on. Thank you very much. Thank you, Your Honor. Mr. Fisher, I understand, Mr. Tucker, that you are court-appointed. Thank you very much for your service to this court. We appreciate it. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, James A. Wynn, Jr., Henry F. Floyd